May it please the court, Annabelle Blanco appearing on behalf of petitioner Mr. Modesto Aleman Vargas. If it's alright with the court, I'd like to reserve two minutes for rebuttal. Your honors, we're very grateful to have been invited here as pro bono counsel for purposes of oral arguments. I'm going to argue the two primary issues that have been the focus of the party's briefing and submission of supplemental authorities, namely the existence of a statutorily protected ground and the government's unwillingness or inability to control Mr. Aleman Vargas' persecutors. Now with respect to the first issue, the immigration judge and Board of Immigration Appeals both misconstrued and failed to adequately address the particular social group to which Mr. Aleman Vargas belongs, and that PSG is painful... As I understand it, the government has essentially so conceded and said that if we agree with your position on the enabler, then I'm willing we should remand on the other issue. Is that not... Could you do better than that? I.e., would we do better than having you remand? Your honor, we... Our position is that the case law supports your finding that Mr. Aleman Vargas is entitled to the case. However, if the court feels more comfortable remanding for a more thorough analysis by the BIA and immigration judge, that would be alright also. Would you like me to address the PSG issue first or move on to the enabler unwilling issue? Well, I'd like to hear about the PSG issue because it seems to have been a moving target below. How are you now defining it? Your honor, we are defining the PSG as defined in our written briefs and also as defined by Mr. Aleman Vargas before the immigration judge in his credible family view and his testimony before the IJ. And that is, individuals or people who are perceived as threats by the cartel, by a cartel, because they are known perpetrated by the cartel. And what I mean by that is, what this court has already found to be a potentially cognizable PSG in prior of its cases. So, for example, the primary case you cite in our brief is Enrique Rivas vs. Holder, where this court, say name wrong, held that people who are perceived as threats by the cartel because they are witnesses who testify against gang members may be cognizable. Testify. Isn't that significant now? Testify. Yes, your honor. So, if you look at Enrique Rivas' reasoning, you'll see that the significance of the individual testifying is that it makes them a target of the cartel because the cartel then is aware of that potential threat. So, if you see at 1089-90, it goes to the reasoning of Enrique Rivas, that's the cite to the case. The court says, looking to the text of the statute, in the context of persecution, we believe that the perception of the persecutors may matter the most. And in this instance, regardless of what... Why wouldn't that be true of every person who witnesses a criminal act by the cartel because they might go to the police or somehow initiate a criminal prosecution? It seems to me that your definition is so broad that it includes every individual in Mexico who's ever witnessed a criminal act by the cartel. Not quite, your honor. So, the distinguishing and significant factor is the key fact in this case, which is individuals that are witnesses, that are non-witnesses. So, for instance, in this case, it's not just any witness, it's not just any lay person that, you know, witnessed a criminal activity. In this case, the key fact is that Mr. Alan Mon-Vargas and his brother-in-law, they witnessed the cartel and the cartel saw them doing their criminal activity. While they were being chased by the Mexican Navy, right? Your honor, we disagree. We believe that that interpretation that the immigration judge offered of the Navy's presence while the cartel was committing its criminal activity is not quite correct. So, Mr. Alan Mon-Vargas also testified that the Navy is in a sort of cahoots with the gang and in fact... Counsel, questions of cahoots and aside, would it be your position that every sailor aboard the pursuing naval vessel would be part of your PSG because they are known to the cartel as essentially being a threat to them? I'm trying to figure out what the contours of your PSG is. I'm very concerned about the depth of the definition. Your honor, the... So, it's not... So, you'll see that... As I understand your question, everyone in the Navy that was pursuing the cartel members would not be considered a threat in the same way because indeed they would be aiding and abetting the cartel in their criminal activity. That's assuming they're colluding. I'm asking you to assume for purposes of my hypothetical that they're legitimately engaged in anti-cartel investigations and they were pursuing them in order to arrest them. Why wouldn't they be part of your proposed PSG? Well, your honor, this court has already found in prior cases that active members in the military, currently in the military or other government law enforcement, would not qualify because of the issue that you raised, would not qualify as members of a particular social group. However, they if that's the case, then what's the difference other than being sworn law enforcement officers versus a civilian who witnesses criminal behavior? Your honor, the key distinction is that laypersons and individuals are more subject, are more vulnerable and subject to being persecuted and becoming specific targets of the cartel. So, if you look at... I'd appreciate if you could address the unable-armed one question. Yes, your honor. Just very briefly to touch on, to finish my answer to Judge Tolman's question. If you look at the case Madrigal v. Solder, you'll see that there, this court distinguished between past and, between former and current past members of the military in finding and accepting the potential PSG of former Mexican Army soldiers who had participated in anti-drug activity. Again, employing the same reasoning of people who have been perceived as a threat to the cartel. And I'll just quickly point the court to page 506 of that case. But moving to the unable-armed willing to control. Your honors, with respect to that, the immigration judge committed the wrong analysis and reached the wrong conclusion because as evidenced in the record, you can see that they were framed by what are now the obsolete cases of Castro-Martinez v. Holder and related precedent, which in practice, even if not explicitly in practice, created a heightened evidentiary standard for petitioners that didn't report their persecution to the official authorities. Don't we have to conclude that the record, I'm assuming you're relying on the country conditions report, compels the opposite conclusion? Isn't that the case? No, your honor. So applying the standard post-Bernas Rodriguez, which is a preponderance of the evidence based on all of the facts in the record, there is more than enough record evidence to find that Mr. Vargas was subject to persecution by individuals that the government was unable to control. As I understand it, the IJ and the BIA relied on, the evidence as I understand it, does support the fact that the Mexican government was targeting leaders of various cartels, including the one at issue here, the Knights Templar, and killed some of them and arrested them and so on. But it also seems to say many times that if anything, that to rub up the level of violence, not down, and that overall level of violence had not gotten better and had perhaps gotten worse. And the second part of it is completely absent from the IJ and BIA opinions. So again, is this a question of deciding something or remanding it because they didn't attend to a huge chunk of what's in those documents? Your honor, it is our position, our primary position, that the record evidence compels a conclusion that the government would not be able or willing to control Mr. Vargas' persecutors. There's more than abundant evidence of this. Not only did the IJ misconstrue the country of conditions evidence, but also failed to adequately credit Mr. Vargas' own testimony, which was found credible. And you can see the credible determination on CAR 27. Would your position be that that is true as to all Mexican drug cartels? Are you asking us to conclude that the Mexican government is unable to control every criminal enterprise that operates in Mexico? No, your honor, but that's precisely the value of the Bringus-Rodriguez decision. It's that it points the court to the value of the individual's personal testimony, and finding and helping establish, or being enough to establish, that the government would not be able or willing to control the individual-specific persecutors. Is there any evidence in the record that after he fled Tijuana when he got the text message threat, which now is what, 10 years ago or more, did he receive any other text messages after he entered the United States? Your honor, there is no evidence in the record of that. But he's even testified that he was afraid to mention or even reach out to his family back in Mexico to seek even additional support. So in his testimony, he explains that part of the reason he's afraid to even seek letters from his family or anything is because it's so easy for people to be found out and for the cartel to see who's helping you. But the answer to my question is no, he's not received any further threats via text messages. Not as evidenced in the record, your honor, but that's also because he's here in the United States. I think you started to say earlier that you thought the agency misunderstood the part about the Navy chasing the cartel and the incident in question, but you didn't quite finish that answer. Could you explain what you were saying about that? Precisely, your honor. So the agency, a large part of the agency's conclusion depends on the fact that he understood or interpreted Mr. Alamán Vargas' testimony as saying that the Navy was present and chasing the cartel members when they witnessed the activity. But in fact, how could this be so if the same cartel members that Mr. Alamán Vargas and his brother-in-law witnessed that day committing the criminal activities were the same ones that went to his house days later and were the same ones that were sending him text messages years later still seeking, having him as a target and seeking retribution for the fact that he had witnessed those activities. So to the extent that the Navy was present, they were either colluding with the cartel in that moment or they somehow, they were inefficacious in capturing the cartel. So what else would explain why they were dumping bodies over the side of the ship? I don't understand your argument here. I'm not sure. If they weren't being chased by the Mexican Navy, then they would have just passed by in their boat and gone on to the dumping ground. But the testimony by your client was that they were actually trying to get rid of the incriminating bodies, some of whom apparently were still alive, because the Mexican Navy was in high pursuit. Yes, Your Honor, so the issue is, the testimony is that the Mexican Navy was present during when this was happening. But it's not clear why they were present is the point that I'm trying to make. Is it clear in the hearing record this discussion is? Yeah? Okay, yes. One second, Your Honor. I will point you to the evidence in the hearing record. So you can see that the discussion is around CAR 103 to 108. It starts at CAR 103 when the immigration judge, it's quite a short hearing transcript. You can see that the full discussion is there. Okay. Where is the part about the Navy? It says the Navy was flying over us at 103. And then we were fishing there and was the Navy flying over us and they were precisely, and if you see at CAR 116, the immigration judge asks Mr. Aleman Vargas, oh, and the original incident that you were witness to, did you ever report that to the police? Mr. Aleman Vargas says, no, I didn't report it because the police and the cartel, they're the same. They work for the Mexican Navy. So he's clarifying the testimony further there, but the immigration judge discredited that and just assumed that the Navy was indeed like pursuing Mr. Aleman, excuse me. If the Navy was flying over them, it would be throwing people overboard while the Navy was watching them didn't seem like a very smart thing to do. Unless the Navy somehow was aware or somehow. I understand that. So in other words, the notion that they were fleeing the Navy when the Navy was flying over them, it wasn't a question of a boat. You could have seen this. It doesn't seem terribly sensible. Supporting your view that they weren't necessarily fleeing from the Navy. Precisely, Your Honor. I have one other question. Are you in agreement with the government that the cat claim was not briefed in the opening brief? I'm sure you'll agree there's a lot to be desired. And it doesn't appear, it doesn't have any. It mentions this cat claim several times, but it has no separate argument on it. Does that mean that it's waived and we don't reach it? Your Honor, we hope that you do not waive the argument given the unfortunate circumstances of my client having been pro se below before the immigration judge and the BIA and also former counsel. But as we've all said, former counsel did in their supplementary evidence, they did cite, even though they didn't specifically connect the evidence to the cat claim, they did cite the standard for the cat claim and they introduced further additional evidence in support of the cat claim in their supplementary submission. So to the extent that that argument could be found not to have been waived, that's our position. They also didn't make the argument that you've been making about the Navy being in cahoots, not chasing, right? This is a new argument as well? Right, Your Honor. So that argument is with respect to specifically unable or unwilling to control. And just the government argues that we have waived that issue, so this court has found in its prior precedent that there are at least three exceptions to a waiver when an issue is not raised initially in an opening brief, one of those being when the appellee is able to address the issue either in its briefing or in oral argument. So to the extent that that issue, to the extent the government argues that that issue is waived, we posit that it should not be waived because they'll have plenty, they've had plenty of opportunity to address it in their briefing, so they will not be harmed by the fact that we weren't able to address it in ours. Okay, we've taken you way over your time. I think we can hear from the government unless my colleagues have more questions right now. No. I'll still give you a minute for rebuttal. I think we took you past the two minutes, but we'll give you a minute for rebuttal after. Good morning, Your Honors, and may it please the Court. My name is Brayden Moore, and I am here on behalf of the Respondent and Attorney General of the United States. This court should deny the petition for review because the agency's determination that the petitioner failed to advance evidence to satisfy either her claims for liability or CAT is very much supported by substantial evidence and should be left alone by this court. The sole issue, as was discussed with the petitioner, really is whether substantial evidence supports the agency's determination that the petitioner failed to show that any future harm he fears experiencing in Mexico would be inflicted by either the Mexican government or actors that the agency is unable or unwilling to control. And for three central reasons, the record reveals that it was. Wait a minute, please. Thank you. Sure. See, that's the sole issue. So do you maintain your position with regard to the particularly serious crime? No, I'm sorry. The secret social group criteria that if we were to disagree or remand on the neighbor and unwilling that because the BIA did not look at the right social group, we should simply remand. And this is in light of the discussion we had, obviously, in Ms. Blanco's argument. Would we reach that issue or not reach that issue? Right. Your Honor, I don't think we would so much concede that the right social group wasn't discussed. The petitioner did not raise a particular social group or constitute it in any given form. It's more that the petitioner needs to establish the unable or unwilling to control as one aspect of the burden of proof, and that's one that we are going forward with. Your brief specifically says, as I understood it, that the BIA did not analyze the right social group and we should remand. Isn't that what it says in your footnote? No, I would agree with that, Your Honor. I would agree with that, yes. If the unable or unwilling to control was somehow determined to not be supported by substantial evidence, upon remand, the PSG can be flushed out. All right. Would you go ahead, then? Wait a second. That seems to me to put the cart before the horse. I'm not sure I understand your thinking. If we remand it because the government is unable or unwilling to control, don't we have to know what the particular social group is? And I'm so not convinced that there's ever been a clear definition offered by the alien as to what the group consists of. That's precisely it, Your Honor. There was not any PSG offered by the petitioner here, and so the immigration judge did her best to try to kind of scratch out one based on the testimony, and it was described essentially as opposition to the drug cartels. And then there also was discussion why in a certain context that could be a PSG, but in this context was not, and how there wasn't otherwise support for the notion that there was a nexus there either. Wait, I'm sorry. I thought the second one, though, was this having witnessed a crime by the cartel. I.J. might not have agreed with that, but wasn't it contemplated? Yeah, I believe that I.J. tried to kind of define it in a few different ways. I mean, she says forced recruitment there on page eight of the opinion. That wasn't all. There weren't concerns about forced recruitment. I'm sorry, the petitioner was not concerned? That wasn't his argument. That wasn't the particular social group. The particular social group, apparently they said to him, either you join or we'll kill you because you witnessed, and his group somehow revolved around the witnessing and not around recruitment. Right. I think it was on page eight. The respondent also seems to fear retribution by the Knights Templar for his having witnessed what they were doing that day that he was fishing. Wasn't that the other articulation, or at least part of the other articulation? I think that's fair, Your Honor. I think that's fair, Your Honor, yes. I.J. then categorizes that as retribution, not as social. He doesn't discuss that group as a group. He says that's just retribution, personal retribution. Right. I would agree with that, Your Honor. Or having witnessed what they were doing. In short, I think that the immigration judge and the board on the field was essentially trying to extrapolate from the petitioner's testimony what seemed like the closest thing to a social group that the petitioner might have been proposing. Obviously understanding the unsophisticated nature and lack of legal knowledge and all that kind of thing. And so that was the effort to do so. But I think that the agency... The VA was very clear about it. So the respondent is not made clear in what it thought the social group was. He's not shown that individuals targeted for recruitment with criminal gangs in Mexico would be perceived by society as a particular social group. That's the only particular social group they had in question. The BIA. Correct. But the BIA, of course, also agreed with the determination that the petitioner failed to show that the Mexican government would be either unable or unwilling to protect him. And obviously being a central part of a prosecution claim, that was what the BIA there is focusing on as the opinion goes on and what we argued in our brief as well. And there's three main reasons why substantial evidence does support the court's finding here. And that is, first, the petitioner has waived any claim because there is simply no mention or challenge to the agency's determination in the opening brief. You discussed it in your brief for many pages before you mentioned any notion of waiver. And since it's been teed up and you've had your shot at the issue, which is really the reason for enforcing a waiver in this court, why shouldn't we reach the issue? You've had your say on it. And only after that did you mention sort of in passing that it hadn't been briefed. So, if anything, you're at an advantage and they're at a disadvantage because they haven't briefed in even half.  I would submit that it is a requirement for a reason, Your Honor. A time-honored requirement that has been upheld by this court for a reason. The petitioner also did not raise this before the board, nor in the opening brief. And I would respectfully disagree that we mentioned in passing. I mean, obviously, there was an argument to focus on, but we did state it. And as to your question about a petitioner's contention that don't we already say everything we need to say? Obviously, the argument that she presented, opposing counsel presented, that the Navy is in cahoots with petitioner was not addressed in the brief because it was not addressed in petitioner's brief. And that very much is unsupported by the evidence trying to do this on the fly right now. This is kind of the reason, I think, that it's a little bit, you know, a little bit of a very difficult thing to try to get a pass waiver. I'm not in cahoots or not in cahoots. The notion that the Navy was up there watching and they threw bodies into the water and that they were fleeing from the Navy while they were throwing bodies in the water and the Navy was up in the sky watching them doesn't hang together very well. No, I would agree with that, Your Honor. It's not supported by the record. I mean, the regime was fleeing and it just doesn't, I mean, it just kind of belies common sense that a cartel would be fleeing the Navy at the same time that it's working in cahoots with it, right? So, I think that that's just very much unsupported. What about the country conditions reports? I think I said earlier the way I read it, which is, yes, there's a lot of, you in your brief spend a lot of time on the evidence that the Mexican government was in fact trying to do something basically by attacking the leaders. But the standard is unable or unwilling. And even if the Mexican government was, the country conditions reports also is quite clear about the fact that the cartels in general, and this one in particular, weren't getting deterred by all this. In fact, if anything, the violence was getting worse because there was internal contention within the cartels when their leaders were being killed and that the numbers were going up, not down. And none of that is in the discussion in your brief at all or in the IJ's discussion either. And the BIA does affirm the IJ's determination. So under our case law, that's sufficient to exhaust. So why don't we at least remand to say you didn't look at a big chunk of the country conditions. When you looked at it or not, you didn't account for it. I think the unable or unwillingness discussion was obviously highlighted by the petitioner's own testimony that the very contention he made in alliance between the Navy and the Knights Templar was belied by his own testimony that the Navy was pursuing the boat with the Knights Templar cartel members at the very moment that he first encountered them. Where does it say they were pursuing the boat? They were up there in the sky. And so if somebody was throwing bodies over the side, they would have seen them. Where did the point come from? I'm really confused on the record here. I'm looking at the IJ's order at page 6. I don't have the administrative record site. And it says, he states that in 2011 upon return to Mexico, he was working, fishing, when the cartel was fleeing the Mexican Navy in a small boat. The cartel was in a small boat. And I'm kidding. My question is, they had bodies on that boat that they were going to disappear. He said, his brother witnessed it, and then the brother-in-law disappears in three months, in the last three months. But he talked about, IJ recounts, three days later, two individuals by the name of Batata and Cuatre from the drug cartel came to his home in the presence of his family and said that if he didn't join or work for them, they would kill him and disappear him. They gave him 12 hours to turn himself in. Isn't that attempted recruitment? What am I missing here? I think that's what the IJ noted, was that you have a visit to the house where they give him an ultimatum of, you know, join or else. Right? And so I think that's what the IJ was noting. I think, you know, it was also obviously because of what he witnessed. So I think there is a retaliatory action in the sense that the men are showing up at the house and saying because you witnessed this, you better, you know, be with us or we'll take you as against us kind of thing. But yes, I think the recruitment... Counsel, doesn't that fall, you can't remember the Supreme Court case that's been in by Justice Scalia involving recruitment efforts by the Shining Path in Peru. And the Supreme Court said that you're not entitled to asylum because you're resisting recruitment efforts. Right. And so I want to answer your Honor's question, but are you just saying that this was an instance of recruitment and that is not something that can constitute a particular social group? Yeah, because of the fact that this definition of particular social group has been a moving target from the beginning of the litigation. It's different today based on what counsel is arguing than what the IJ understood the alien to be saying at the time of the merits hearing. I think that the recruitment is described in the, you know, kind of broadly by the IJ. And obviously I think the IJ is moving on to the more meaty part of the testimony and the decision. And for those reasons, you know, the government also in this brief is focusing on the unable or unwilling. I do think it's fair to say that the act of showing up at the petitioner's house after having observed something was an effort to recruit him into the gang. It was also an effort to intimidate. You know, it was also an effort to essentially imply that he would be retaliated against if he did anything other than join the gang. So there's a lot, there's different things kind of converging here, Your Honor. And obviously I think it was a little bit of a challenge to sort through it given that the petitioner did not actually propose a social group. So that's really why the government today is focused on the unable or unwilling control standard. And we think that the substantial evidence supports that finding because the record really actually demonstrates many, many vigorous actions by the Mexican government to combat the cartels through the relevant period of time there. And in particular, I'd like to call the Court's attention to the kind of localization of this. The petitioner is from Nicaraguan. And with respect to Nicaraguan, the country conditions evidence shows that the government actually first took on La Familia with the arrest, sometimes killings, of many prominent members, almost completely dismantling it before also then at the end of this time period going after the offshoot, which is the 9th Templar. So there was an arrest of a primary cartel member followed by the killing of one of the leaders along with all sorts of additional actions against 9th Templar in particular. So even if we localize the actions of the government, they're very strong and very supportive of actually being active here. Do you have any comment on my observation that there is a... Yes, the record supports that the government was going after leaders. But as the offshoot part demonstrates, what happened is it also supports the conclusion that this was not a terribly... this was not a successful way of curbing the actual violence by the cartels. And the emergence of the 9th Templars essentially demonstrated that. They killed off one organization and they generated another one. And again, there's no recognition in the IJ opinion or in your argument of the ultimate conclusion in the Contra Conditions Report, which is things weren't getting better, they were getting worse. Is that an unfair characterization? I believe it is, Your Honor. Of course, there is no criterion. There is no standard, certainly not a requirement that the government has to completely eradicate the problem, especially when the problem is as immense as the drug cartels in Mexico. I mean, this is really a problem of epic proportion. And therefore, we're talking about whether reasonable actions were taken, whether progress was made. And I think it's very clear that a lot of progress was made that really kind of knocked back, knocked down, and weakened. The two cartels that are most at issue here through a variety of actions. There's also the notion of the 10,000-member security force that was put in the area by the former president. Again, showing that this was at the very top of the government's list in terms of priorities to meet power with power. I completely agree that the record demonstrates that the Mexican government was not unwilling. They were willing. But what about Abel? Well, again, so returning back to what I was saying, I think the ability here is shown, Your Honor, because while they certainly have not completely eradicated the problem, the government cannot be held responsible, or certainly under this standard, a government cannot be held responsible, where it is doing everything it can to fight a problem and another cartel pops up in response to it. I mean, that is a new problem, which it then has to go fight. When did the actions that you're saying the government successfully took, how do they line up with when the brother-in-law who he was with in the incident was killed? Sure. Well, so the record evidence essentially goes from about 2006 to 2014, and there's actually evidence in the record that as the time period went on, the government was having more and more success. So right around the time when this incident occurred, things had certainly turned for the better in terms of the successfulness of the government in fighting the cartels. But according to Petitioner, the relative he was with in witnessing this incident was killed by the cartel because he was a witness. Did that happen after the successful government efforts? Well, I think it's hard to pinpoint a month or even a year, Your Honor. It's obviously an evolution. But I do think, I mean, there is one particular citation that I would note where they discussed the fact that somewhere north of 80% of Mexican citizens in a poll actually found that situations had improved and that the Mexican government's efforts were notable, were actually instrumental. So I think what you can see is an arc that goes in the right way there. Again, an immense problem cannot be completely eradicated. There's no requirement that it be done so. But the effort was there also met with success that had not previously been experienced in the country in terms of the extent of the violence that was being perpetrated by the cartels here. How specifically should we look at whether the success has been successful, though? I mean, this cartel with this family, it seems like if we credit his testimony, they killed the other witness. So should we think that he's not going to be killed because of the general success, even if we have that specific evidence? Yes, Your Honor. I think it's certainly fair to, again, with the standard being substantial evidence and deference to the agency's findings, that the combination of the improvement in the safety of the Mexican people along with the fact that the chances of any individual being picked off in violence are still, even though there is a huge problem here, are still very remote. In fact, there was one citation to how many per 100,000 people are killed by the drug violence or by violence in Mexico. And the number, I forget exactly, but it was around, that had gone down to approximately 50 people per 100,000. And obviously that's, I'm sorry? A lot of people. 50 per 100,000. I gather that the crime rate in the United States, a similar crime rate, which is very high, is a small fraction of that. Yeah, I believe at the time, Your Honor, that the crime rate in the United States was approximately six or so. But again, on scale, it's still a very small chance of somebody being individually targeted or part of the collateral damage, so to speak, at the level of this violence. Can I ask again whether my understanding of the record, which is that the actual number of killings and crimes went up, not down, is incorrect? The actual number of the killings went up? I don't know if that's specifically discussed, Your Honor. What's discussed most is that when the president kind of first launched this very aggressive effort to combat and curtail the cartels, initially it did cause a spike in violence. And that was for a variety of reasons. The cartels were fighting for territory, and there was an escalation. That escalation then continued to go down over the years that followed there. And at the end of the well-being time period— There's a congressional research report that said that the government's efforts to remarkably lower the violence has not shown results. The violence was remarkably brutal. There were 60,000 homicides related to organized crime between 2006 and 2013. Although they successfully removed key leaders from each of the many cartel groups, these efforts did not successfully reduce—I'm not quoting that, but the efforts did not successfully reduce violence because it caused instead consolidation and fragmentation of organized criminal groups. And as a result, the violence in Mexico grew more extensive, more volatile, and less predictable. So, I mean, my concern is that the analysis just takes no account of that. It simply looks at the fact that, yes, they were dealing with leaders of the cartels, but it didn't seem to be doing anything. I understand the concern, Your Honor, but I think— I would call the Court's attention to note one particular thing. The immigration judge actually submitted an article from CNN into the record, I believe, and that article in particular notes that, under President Calderón's direct confrontation strategy, the Mexican government killed more than 40 major cartel members as of April 2012. Again, so we're talking about an arc, and towards the end of the relevant time period, ultimately we're talking about a fear of return and a fear of harm if Petitioner were to return. And in 2012, you have a citation to more than 40 major cartel members killed by the government. I just think that's not only indicative of a willingness, but also an ability. And by the I.J. actually submitting that CNN article, I think the I.J. is revealing that she's engaged with the evidence itself, with the country conditions evidence. If my colleagues have no other questions, I think we should go to rebuttal. And I said one minute, but we've now taken the government even more over time, so let's give you two minutes. Thank you, Your Honor. Thank you, Your Honor. Just to address the two primary issues that seem to have been the focus of Your Honor's questions. First of all, it's untrue that the particular social group in this case was not properly articulated by my client. As early as this credible fear interview, when asked, why did they target you specifically, and this is at CAR 143, my client responded, because of what I saw, and they thought that I would go around and talk to you about it. So it's because they saw him as a witness, and saw him as a potential threat, that they then went to his house, and then told him, you either join us, or you're subject to being killed and disappeared, just like the other people that you saw that were killed and disappeared. Counsel, would you concede that at least as to the recruitment aspect, that that is covered by the Supreme Court decision that says you're not entitled to asylum for rejecting recruitment efforts? I will concede that the recruitment aspect has been covered by prior case law, but that's not the PSG in this case. My client has been targeted not for recruitment, he's not claiming that his particular social group is individual, subject to recruitment. His individual social group is that of people that have witnessed cartel activity, and are known by the cartel to have witnessed that activity, and because of that, have become a perceived threat. And again, the important thing here is what the cartel thinks of my client, a perceived threat by the cartel. And this is, I cite it as a critical fear interview, but you can also see this throughout his testimony before the BIA. So the only thing that was missing was for him to say, my PSG is, and of course as a pro se client, it's very unlikely that he would have said that. Moving on to the second major issue, unable or unwilling. As your honors have hashed out, the evidence is far, far from clear. It's far from clear that the government, the Mexican government here, is not only willing, but also able to control my client's persecutors. And the issue here is that if you see the ID's analysis, the focus, an exorbitant focus of the analysis was on my client's not having gone to the police to report his incident. He focuses more on that than on all of his other testimony about why he might not have gone, why he feared going to the police. And that's the issue that was addressed by his court in Reyes Rodriguez, and that's the issue with the immigration judge's analysis of his decision that there was just not an adequate accounting of the evidence. It was a myopic reading of the record. The fact that the Mexican government might have taken some successful steps to address this activity is bullied by all of the other evidence in the record, not only my client's testimony, but also all of the other evidence in the record that shows that no, in fact, they have not been successfully able to deal with this issue. So I'm just going to point, Your Honors, really quickly to CAR-168, which is a CNN library report on the Mexico drug war facts, which shows that 248 federal police commanders had been taken at that moment subject to corruption. There's also CAR-227-28, which is the Congressional Research Service report that Judge Berzin was addressing earlier. CAR-301. But the argument, counsel, the argument really has to be that we must conclude that the record compels the officer to vote. That is not our— In reading that evidence, right? Our argument, Your Honor, is that the record compels that conclusion, that the government is not able or willing to control. To the extent that the court is uncomfortable with that conclusion, we'd rather defer to the BIA for a more proper analysis of the evidence. That's all right as well. If there are no further questions— Thank you, both sides, for the very helpful arguments, and thank you for taking this pro bono representation. It really helps our court, and we very much appreciate your assistance. So with that, this case is submitted, and we are adjourned for the day. Thank you both very much. Your Honor, let me just add to your accolade. I think it's particularly difficult when we ask you to step in and represent the client on the basis of briefings done by former counsel. So thank you again. Thank you. It was a pleasure. This court for this session stands adjourned.
judges: BERZON, TALLMAN, FRIEDLAND